Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL V

| | | |
|---|---|---|
| Autoridad De Acueductos Y Alcantarillados De Puerto Rico (AAA) **Recurrida** Vs. Hermandad Independiente De Empleados Profesionales De La AAA (HIEPAAA) **Peticionaria** | TA2025CE00071 | *CERTIORARI* procedente del Tribunal de Primera Instancia Civil Núm. SJ2022CV00264 Sobre: Impugnación De Laudo De Arbitraje en el Caso Núm. A18-178 |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Bonilla Ortiz y la Jueza Mateu Meléndez.

**Hernández Sánchez, Juez Ponente**

### RESOLUCIÓN

En San Juan, Puerto Rico, a 11 de agosto de 2025.

El 2 de julio de 2025, la Hermandad Independiente de Empleados de la Autoridad de Acueductos y Alcantarillados (HIEPAAA o la peticionaria) compareció ante nos mediante *Certiorari* y solicitó la revisión de una *Sentencia* que se emitió y notificó el 4 de junio de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar la *Impugnación de Laudo* que presentó la Autoridad de Acueductos y Alcantarillados (AAA o la recurrida) y, en consecuencia, dejó sin efecto la determinación emitida el 15 de diciembre de 2021 por la honorable árbitro, la Sra. Yolanda Cotto Rivera.

Por los fundamentos que expondremos a continuación, ***denegamos*** el recurso de epígrafe.

I.

El 14 de enero de 2022, la AAA presentó una *Impugnación de Laudo* ante el TPI.[1] Sostuvo que, en el Laudo de Arbitraje para el caso A-18-178, le correspondía a la Honorable Árbitro determinar si la AAA actuó conforme a derecho al eliminar la licencia sindical completa con paga al presidente de la HIEPAAA y la licencia parcial con paga al vicepresidente o a quien(es) le sustituyera(n) en caso de ausencias prolongadas. Indicó que llevó a cabo dicha eliminación en cumplimiento con lo dispuesto en la Ley Núm. 3-2017, según enmendada, conocida como *Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para Garantizar el Funcionamiento del Gobierno de Puerto Rico*, 3 LPRA sec. 9391, *et seq.* (Ley Núm. 3-2017) y la Ley Núm. 26-2017, según enmendada, conocida como *Ley de Cumplimiento con el Plan Fiscal*, 3 LPRA sec. 9461, *et seq.* Afirmó que estas leyes dejaron sin efecto toda cláusula contractual o estipulación en convenios colectivos que fuese contraria a sus disposiciones.

Adujo que, en el presente caso, la Árbitro omitió evaluar la legalidad de la licencia sindical e ignoró la política pública claramente establecida por estos estatutos antes mencionados al determinar que la AAA infringió el Convenio Colectivo que suscribió con la HIEPAAA y la Estipulación que se acordó entre las partes el 12 de septiembre de 2014, al sustituir la licencia sindical completa por una compensable. De este modo, puntualizó que la Árbitro cometió los siguientes errores:

> **Erró el Honorable Árbitro al ignorar el texto de la Ley Núm. 3-2017 y la Ley Núm. 26-2017 y la política pública que permea dicho estatuto y resolver que la estipulación del 13 de septiembre de 2014 y el Convenio Colectivo entre la Autoridad y la Unión van por encima de la ley.**

> **Erró el Honorable Árbitro al no resolver todas las controversias planteadas ante su consideración y no**

---

[1] Véase, Entrada 1 del apéndice del recurso, SUMAC TA.

**entrar a dilucidar la legalidad del acuerdo contractual sobre licencia sindical.**

En cuanto al primer error, sostuvo que, la Ley Núm. 3-2017, *supra*, dejó sin efecto todas las cláusulas de naturaleza económica contenidas en el Convenio Colectivo vigente con la Unión, así como cualquier estipulación posterior que las enmendara. Asimismo, planteó que dicha Ley, en conjunto con la Ley Núm. 26-2017, *supra*, eliminó aquellas cláusulas no económicas que tuvieran un efecto presupuestario directo o indirecto. Expresó que, conforme a este marco legal, sustituyó la licencia sindical con paga por una licencia sindical reembolsable, en cumplimiento con los límites impuestos por el legislador para atender la crisis fiscal del país.

Expuso que el último Convenio Colectivo firmado entre las partes fue el del periodo 2012-2016, el cual, conforme al Art. 8 de la Ley Núm. 3-2017, solo podía mantenerse vigente en lo relacionado a las cláusulas no económicas que no contravinieran la nueva legislación fiscal. A su vez, manifestó que, la Ley Núm. 26-2017, *supra*, estableció un régimen uniforme de beneficios marginales para todos los empleados públicos, incluyendo a los unionados de las corporaciones públicas, limitando la facultad patronal de conceder beneficios distintos a los allí dispuestos.

De igual forma, añadió que, la licencia sindical con paga pactada mediante convenio colectivo y no por mandato legal, tenía un efecto económico concreto, pues conllevaba el pago de salario por funciones no relacionadas al servicio en la AAA. Sostuvo que, esa carga económica convertía la licencia en una cláusula de carácter económico, la cual quedó automáticamente sin efecto por disposición de la Ley Núm. 3-2017, *supra*.

En cuanto a la estipulación suscrita el 12 de septiembre de 2014, mediante la cual se enmendaron ciertas condiciones del Convenio Colectivo al amparo de la Ley Núm. 66-2014, según

enmendada, conocida como *Ley Especial de Sostenibilidad Fiscal y Operacional del Gobierno del Estado Libre Asociado de Puerto Rico*, 3 LPRA sec. 9101, *et seq.*, argumentó que la misma fue firmada fuera del término dispuesto por el Art. 11(k) de dicha Ley y que, además, su vigencia quedó sujeta expresamente a la vigencia de esa legislación. Así pues, planteó que en virtud de que la Ley Núm. 66-2014, *supra*, venció el 1 de julio de 2017 y fue derogada tácitamente mediante la aprobación de la Ley Núm. 3-2017, *supra*, dicha estipulación perdió toda validez y eficacia, por lo que no podía invocarse para sostener la vigencia de la licencia sindical con paga.

Por los motivos antes expuesto, concluyó que la licencia sindical con paga constituía una cláusula económica eliminada válidamente por las disposiciones de la Ley Núm. 3-2017, *supra*, y ratificada por la Ley Núm. 26-2017, *supra*, por lo que cualquier determinación que ordenara su restitución resultaría contraria al ordenamiento legal vigente y a la política pública fiscal establecida por el Estado.

Ahora bien, para fundamentar su segundo señalamiento de error, explicó que, la licencia sindical consistía en la concesión de tiempo libre a un empleado regular de la AAA, con paga y sin que se cargara a ninguna licencia dispuesta por ley, para que dicho empleado realizara labores internas de la Unión. Particularmente, puntualizó que trataba de un beneficio mediante el cual la AAA le pagaba a un empleado por actividades que no guardaban relación con sus funciones oficiales. Aclaró que, a pesar de que esta licencia fue negociada como parte de un convenio colectivo entre las partes, no estaba reconocida por ley, ni contaba con base legal alguna para su subsistencia frente a legislación estatal que prohibía expresamente su concesión.

Esbozó que la Ley Núm. 3-2017, *supra*, se aprobó para atender la grave crisis fiscal del país y expresamente disponía que

sus disposiciones prevalecían sobre cualquier otra ley, contrato o convenio. Indicó que, esta norma tenía primacía legal y dejó sin efecto toda cláusula económica de convenios colectivos que fuera contraria a sus disposiciones. A su vez, adujo que la Ley Núm. 26-2017, *supra*, establecía de forma clara y exhaustiva cuáles eran las licencias con paga autorizadas en el ámbito público, sin incluir entre ellas la licencia sindical. Puntualizó que ambas leyes perseguían uniformar y racionalizar el uso de fondos públicos ante la emergencia fiscal, y proscribían expresamente compensaciones económicas no autorizadas por ley.

Por otro lado, expresó que, en este caso, la licencia sindical constituía una compensación monetaria extraordinaria según el Art. 11 de la Ley Núm. 66-2014, 3 LPRA sec. 9117, política pública que fue incorporada por referencia en la Ley Núm.3-2017, *supra.* Argumentó que dicha compensación, por estar desprovista de base legal, no podía continuar concediéndose. Asimismo, manifestó que la nulidad de la licencia sindical también se sostenía desde el ámbito del derecho laboral, tanto estatal como federal. Esbozó que, a nivel estatal, la Ley Núm. 99 de 23 de junio de 1955, mejor conocida como *Ley que Prohíbe el Pago por Patronos a Representantes de Empleados*, 29 LPRA sec. 81, *et seq.*, prohibía que los patronos pagaran directa o indirectamente dinero a oficiales sindicales por servicios no relacionados con su empleo ordinario. Añadió que, Opiniones del Secretario de Justicia habían reiterado esta postura al determinar que los pagos con fondos públicos a oficiales sindicales por tiempo dedicado a gestiones de la unión son ilegales.

A nivel federal, señaló que, la Sección 302 del Labor Management Relations Act prohibía de forma expresa que un patrono realizara pagos a representantes sindicales por servicios distintos a sus funciones laborales. Particularmente, expresó que, en *Titan Tire Corp. v. United Steelworkers*, el Tribunal de Apelaciones

del Séptimo Circuito resolvió que el pago total del salario de un representante sindical era contrario al propósito de la Sección 302 antes expuesta, que buscaba evitar conflictos de intereses entre patronos y uniones. Manifestó que, en ese caso, el tribunal destacó que la norma buscaba proteger la integridad del movimiento obrero y la confianza pública en el mismo, evitando que oficiales sindicales se beneficiaran personalmente a costa de los trabajadores.

En vista de lo anterior, planteó que, el pago del salario completo a un dirigente sindical que no realizaba funciones oficiales para el patrono representaba una violación tanto al ordenamiento jurídico estatal como federal. Puntualizó que se trataba de un acto que comprometía la objetividad del representante sindical y minaba su deber fiduciario hacia los empleados que representaba. Por esta razón, insistió que, aun cuando la licencia había sido incluida en un convenio colectivo, su contenido era contrario a derecho y por tanto radicalmente nulo.

Añadió que, la jurisprudencia puertorriqueña había sido consistente en cuanto a que los actos contrarios a la ley eran nulos y no podían generar consecuencias jurídicas por lo que la nulidad de un acto contrario a derecho no podía ser subsanado por su ejecución continuada ni por el consentimiento tácito de las partes. Por consiguiente, concluyó que, al haberse demostrado que la cláusula contractual que autorizaba la licencia sindical con paga era contraria a las disposiciones de la Ley Núm. 3-2017, *supra*, la Ley 26-2017, *supra*, la Ley Núm. 99-1955, *supra*, y la Sección 302 del LMRA, *supra*, la misma era nula y no podía producir efecto jurídico alguno. Así pues, insistió que la decisión de la Árbitro al ordenar su reinstalación y conceder remedios basados en ella carecía de fundamento legal, al sustentarse en una cláusula inexistente en derecho. En consecuencia, sostuvo que actuó correctamente al dejar sin efecto dicha licencia en cumplimiento con la normativa aplicable.

En respuesta, el 14 de febrero de 2022, la HIEPAAA presentó su *Oposición a Impugnación de Laudo*.[2] En primer lugar, argumentó que, en el presente caso no existía una violación a la política pública que justificara la revisión judicial del laudo arbitral. Indicó que, si bien la AAA tenía la razón al expresar que una política pública podía ser fundamento para anular un laudo, dicha política debía estar "bien definida y ser predominante". No obstante, afirmó que tal circunstancia no se configura aquí. Particularmente expuso que la cláusula de licencia sindical contenida en el Art. X del Convenio Colectivo no contravenía política pública alguna, según el contenido de las leyes aplicables.

Planteó que, el convenio colectivo negociado entre las partes tuvo vigencia desde el 31 de mayo de 2012 hasta el 30 de junio de 2016, y continuó vigente por disposición de la Ley Núm. 66-2014, *supra*. Sostuvo que dicha vigencia fue reconocida expresamente en la Estipulación del 12 de septiembre de 2014, suscrita al amparo del Art. 11(i), de la Ley Núm. 66-2014, *supra*, en la cual ambas partes acordaron mantener ciertas disposiciones, incluyendo la licencia sindical con paga del presidente de la Unión. Aseguró que, esta estipulación siguió en vigor incluso luego de la aprobación de la Ley Núm. 3-2017, *supra*, la cual no modificó ni dejó sin efecto la Ley Núm. 66-2014, *supra*, ni los acuerdos pactados bajo su amparo.

Por otra parte, adujo que la Ley Núm. 26-2017, no contenía definición del término "beneficio marginal" ni prohibía expresamente licencias con paga que no estuviesen estatutariamente dispuestas, como es el caso de la licencia sindical acordada por las partes. Esbozó que, contrario a lo que sostenía la parte recurrida, dicha licencia no constituía un pago a otra entidad. Afirmó que el salario que recibía el presidente del sindicato no era para terceros, sino una

---

[2] Véase, Entrada 2 del apéndice del recurso, SUMAC TA.

compensación por su trabajo en la administración de las relaciones obrero-patronales, conforme a la política pública expresada en la Ley Núm.130 de 8 de mayo de 1945, según enmendada, conocida como *Ley de Relaciones de Trabajo de Puerto Rico*, 29 LPRA sec. 62, *et seq.*, la cual promovía la coadministración y el manejo ordenado de los convenios colectivos.

Argumentó que afirmar que la Estipulación quedó sin efecto automáticamente al expirar la Ley Núm. 66-2014, *supra*, era insostenible y llevaría a considerar también sin efecto las concesiones hechas por la unión en ese mismo acuerdo, entre ellas reducciones en beneficios que favorecían a la parte patronal. En virtud de lo anterior, concluyó que la Honorable Árbitro actuó correctamente al concluir que la Estipulación permanecía vigente y que la Ley Núm. 3-2017, *supra*, no revocó la legislación ni los acuerdos anteriores. Indicó que, de hecho, la Ley 3-2017, *supra*, remitía expresamente a la Ley Núm. 66-2014, *supra*, para efectos de definir lo que constituía un "aumento en beneficios económicos" o "compensación monetaria extraordinaria", sin extender ni redefinir dichos términos.

Asimismo, señaló que la licencia sindical incluida en el Art. X del Convenio Colectivo no constituía un "beneficio marginal" conforme a las definiciones aceptadas por la doctrina jurídica. Indicó que distintos autores y fuentes legales —como el Diccionario de Términos Jurídicos de Ignacio Rivera, el Léxico Laboral Puertorriqueño de Héctor Arroyo Aguilar y el Black's Law Dictionary— definían los beneficios marginales como ventajas adicionales al salario, tales como planes médicos, pensiones, seguros o bonificaciones. Insistió que la licencia sindical aquí impugnada no era un beneficio general para todos los empleados ni una ventaja adicional al salario; sino que era una disposición

específica y *sui generis*, acordada para facilitar el cumplimiento del deber legal de representación sindical.

Además, puntualizó que conforme a la interpretación oficial de la Carta Circular Núm. 144-17 de la Oficina de Gerencia y Presupuesto, la prohibición contenida en las Leyes 66-2014 y 3-2017, *supra*, respecto a aumentos en beneficios económicos no aplicaba a beneficios existentes que ya formaban parte de la compensación del empleado al momento de la aprobación de dichas leyes. Aseguró que la licencia sindical con paga no representaba un aumento nuevo ni extraordinario, sino una disposición ya vigente al amparo de convenios previos. En consecuencia, concluyó que dicha licencia quedaba fuera del alcance de las prohibiciones impuestas por las leyes citadas.

Por otro lado, indicó que no existe prueba en el expediente que demostrara que la cláusula en controversia hubiese provocado un agravamiento en el presupuesto de la AAA, ni constaba que se hubiese sometido consulta alguna a la Autoridad de Asesoría Financiera y Fiscal de Puerto Rico (AAFAF), conforme requería la Ley Núm. 3-2017, *supra*. Argumentó que la mera alegación de impacto presupuestario no era suficiente para invalidar cláusulas válidamente pactadas, y mucho menos en ausencia de evaluación técnica por las autoridades competentes.

Finalmente, destacó que la política pública vigente favorecía el respeto a los mecanismos contractuales de solución de conflictos, como el arbitraje, según había sostenido reiteradamente nuestra jurisprudencia por lo que pretender anular una cláusula negociada y pactada bajo el procedimiento establecido, sin agotar esos mecanismos, contravenía dicha política pública. En vista de ello, sostuvo que le correspondía al Tribunal, por tanto, sostener el laudo arbitral y reconocer la validez del acuerdo alcanzado entre las partes.

En cuanto al segundo señalamiento de error de la parte recurrida sobre la alegada ilegalidad de la disposición contractual sobre licencia sindical, aclaró que no se trataba de un pago hecho a la Unión, sino de un salario pagado al empleado por servicios que presta en su rol de coadministrador del Convenio Colectivo, en conjunto con representantes del patrono. Indicó que, esta práctica respondía al modelo colaborativo que promovía la Ley Núm. 130-1945, *supra*, la cual reconocía la necesidad de facilitar el cumplimiento del convenio mediante mecanismos de representación efectiva.

Por otra parte, rechazó los argumentos de la parte recurrida basados en legislación federal por entender que las normas no eran aplicables a empleados de corporaciones públicas en Puerto Rico. Expresó que la obligación de pagar el salario al presidente del sindicato no nacía de un mandato legal aislado, sino de una cláusula válidamente pactada como parte del proceso de negociación colectiva. Es decir, que era el resultado de un acuerdo bilateral y no de una imposición unilateral.

Planteó que la normativa que prohibía ciertos pagos a dirigentes sindicales tenía como propósito evitar la corrupción en las relaciones laborales, pero no impedía, ni en Puerto Rico existe prohibición alguna, que las partes pactaran una licencia sindical con paga, especialmente cuando esta se integraba funcionalmente al proceso de coadministración del convenio. Por tanto, concluyó que la cláusula no podía tildarse de ilegal por carecer de una disposición legal que así lo estableciera.

Por último, citó al profesor Demetrio Fernández Quiñones, quien destacaba en su obra, *El Arbitraje Obrero Patronal*, que los laudos arbitrales no podían ser anulados por errores de hecho o derecho, salvo en aquellos casos donde el convenio colectivo requiriera expresamente que el árbitro decidiera "conforme a

derecho". Señaló que, en el presente caso, dicho requisito no estaba presente. Además, añadió que así lo había reiterado nuestra jurisprudencia en casos como *JRT v. National Packing Co.*, *Febos y otros v. Marpe Constr. Corp*, y *JRT v. Orange Crush*, donde se establecía que el tribunal no debía revisar los méritos del laudo salvo que se estableciera una causal específica de nulidad. Por estos motivos, argumentó que, al no configurarse una causal válida para la anulación del laudo, y habiendo actuado la Honorable Árbitro dentro del marco de su jurisdicción y conforme a la sumisión establecida, el laudo emitido debía ser confirmado en su totalidad

El 21 de marzo de 2022, la AAA presentó una *Réplica a "Oposición a Impugnación de Laudo"*. Evaluadas las posturas de ambas partes, el 4 de junio de 2025, el TPI emitió una *Sentencia.*[3] En primer lugar, realizó las siguientes determinaciones de hechos:

1. El Convenio Colectivo aplicable a la presente querella es el vigente desde el 31 de mayo de 2012 hasta el 30 de junio de 2016. El mismo recoge los acuerdos alcanzados por las partes producto de la negociación colectiva. Por tanto, es un contrato, con fuerza de Ley que rige la relación obrero patronal.

2. En lo pertinente, el Artículo X de dicho Convenio Colectivo contiene todo lo relativo a la licencia sindical concedida a los representantes de la Unión para la administración de este y su deber de representación con los miembros de la Unidad Apropiada. Dicha licencia consiste en una Licencia de Unión completa para el presidente y un Licencia de Unión de un (1) día a la semana para el vicepresidente.

3. A raíz de la aprobación de la Ley Núm. 66 de 17 de junio de 2014, conocida como "Ley Especial de Sostenibilidad Fiscal y Operacional del Gobierno del Estado Libre Asociado de Puerto Rico", las partes sostuvieron una negociación alterna cuyos acuerdos fueron plasmados en la estipulación suscrita entre las partes el 12 de septiembre de 2014.

4. Aquellas cláusulas del Convenio Colectivo que no fueron alteradas como resultado de dicha estipulación continuaron implementándose según fueron negociadas; entre ellas el Artículo del Convenio Colectivo, objeto de esta controversia. Por tanto, a partir del 12 de septiembre de 2014, el Patrono continuó

---

[3] Véase, Entrada 21 del apéndice del recurso, SUMAC TA.

reconociendo y honrando la licencia sindical establecida en el Artículo X del Convenio Colectivo.

5. En enero de 2017, se aprobó la Ley Núm. 3 de 23 de enero de 2017, conocida como "Ley para atender la crisis económica, fiscal y presupuestaria para garantizar el funcionamiento del gobierno de Puerto Rico".

6. Posteriormente, en abril de 2017, se aprobó la Ley Núm. 26 de 29 de abril de 2017, conocida como Ley de Cumplimiento del Plan Fiscal. A raíz de la aprobación de las mencionadas leyes Núm. 3 y 26, el 1 de mayo de 2017, el Patrono dejó sin efecto el pago de la licencia sindical dispuesta en el Artículo X del Convenio Colectivo y sustituyó la licencia de Unión completa con paga para el presidente, por una licencia con paga reembolsable.

Luego, puntualizó que, la Ley Núm. 3-2017, *supra,* estuvo vigente desde su aprobación el 3 de enero de 2017 hasta el 1 de julio de 2021, y aplicaba a todas las entidades de la Rama Ejecutiva, incluyendo agencias, instrumentalidades y corporaciones públicas, sin importar su grado de autonomía fiscal. Sostuvo que esta ley suspendía la vigencia de cualquier convenio que contradijera su política o interfiriera con su implementación, particularmente aquellos que limitaran la facultad del Gobierno para determinar la plantilla necesaria para su operación y la prestación de servicios. Particularmente, señaló que, el Art. 6 de la referida ley, establecía las licencias no estatutarias que permanecían vigentes, excluyendo las licencias sindicales. Además, expresó que, el Art. 7 del referido estatuto prohibía aumentos en beneficios económicos o compensaciones extraordinarias, salvo las expresamente permitidas, y que el Art. 14 obligaba a suspender cláusulas no económicas que agravaran la situación fiscal, exceptuando licencias no estatutarias relacionadas con riesgos inherentes al empleo.

Por otra parte, manifestó que, la Ley Num. 26-2017, conocida derogaba desde su aprobación toda disposición legal o contractual que otorgara beneficios marginales contrarios a sus disposiciones, sin afectar el derecho de negociación sindical sobre condiciones

laborales y económicas no cubiertas por la ley. Indicó que, esta legislación regulaba específicamente las licencias por vacaciones, enfermedad, maternidad, paternidad, lactancia y otras especiales, sin contemplar las licencias sindicales objeto del laudo impugnado, y limitaba bonificaciones, pago por horas extras y la conversión en dinero de licencias acumuladas.

Conforme al derecho antes expuesto, resolvió que, la AAA estaba impedida de honrar o pagar licencias sindicales. Así pues, declaró Ha Lugar la *Impugnación de Laudo* que presentó la AAA y, en consecuencia, dejó sin efecto la determinación emitida el 15 de diciembre de 2021 por la honorable árbitro, la Sra. Yolanda Cotto Rivera.

Inconforme con este dictamen, el 2 de julio de 2025, la peticionaria presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

> **Erró el Honorable Tribunal de Primera Instancia al interpretar como "Beneficio Marginal" en el marco de la presente controversia la licencia sindical contemplada por el Artículo X del Convenio Colectivo.**

> **Erró el Honorable Tribunal de Primera Instancia en su interpretación sobre el contenido y alcance de los artículos 7 y 11 de la Ley Núm.3-2017 y en obviar el Contenido de la Carta Circular Núm. 144-17 de la Oficina de Gerencia y Presupuesto de 10 de marzo de 2017.**

> **Erró el Honorable Tribunal de Primera Instancia al anular el laudo de arbitraje, bajo el supuesto de que el laudo es contrario a derecho en un contexto en que el laudo no tenía que ser "conforme a derecho".**

Atendido el recurso, el 8 de julio de 2025, emitimos una *Resolución* concediéndole a la AAA hasta el 15 de julio de 2025, para presentar su oposición en cuanto al recurso. Luego la parte recurrida solicitó una prórroga para presentar su postura y se le concedió. Oportunamente, la recurrida presentó su *Oposición A Expedición de Solicitud de Certiorari* y negó que el TPI cometiera los errores que la HIEPAAA le imputó. Con el beneficio de la

comparecencia de ambas partes procedemos a atender el asunto ante nos. *Veamos.*

## II.

El *certiorari* es el vehículo procesal extraordinario utilizado para que un tribunal de mayor jerarquía pueda corregir un error de derecho cometido por un tribunal inferior. *Torres González v. Zaragoza Meléndez*, 211 DPR 821, 846-847 (2023). Los tribunales apelativos tenemos la facultad para expedir un *certiorari* de manera discrecional. Íd., pág. 847. Esta discreción se define como "el poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción". *García v. Padró*, 165 DPR 324, 334 (2005). Asimismo, discreción es una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justa. Íd., pág. 335. Ahora bien, la aludida discreción que tiene este foro apelativo para atender un *certiorari* no es absoluta. Íd. Esto, ya que no tenemos autoridad para actuar de una forma u otra, con abstracción total al resto del derecho, pues ello constituiría abuso de discreción. Íd. Así, "el adecuado ejercicio de la discreción judicial está inexorable e indefectiblemente atado al concepto de la razonabilidad". Íd.

Conforme a la Regla 32 (C) del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, pág.47, 215 DPR __ (2025), el recurso de *certiorari* es el vehículo procesal adecuado para que el Tribunal de Apelaciones revise las sentencias finales emitidas por el TPI sobre laudos de arbitraje. Particularmente, la referida Regla dispone lo siguiente:

> El recurso de *certiorari* para revisar cualquier otra resolución, orden o dictamen revisable por esta vía de conformidad con la ley, incluida una orden de protección, **así como revisar una <u>sentencia final producto de una solicitud de revisión de un laudo de arbitraje</u> del Tribunal de Primera Instancia se formalizará mediante la presentación de una**

**solicitud dentro de los treinta días siguientes a la fecha del archivo en autos de una copia de la notificación de la resolución u orden recurrida**, a menos que alguna ley especial aplicable disponga un término distinto. Este término es de cumplimiento estricto. (Énfasis y subrayado nuestro).

Ahora bien, con el fin de que podamos ejercer de una manera sabia y prudente nuestra facultad discrecional de entender o no en los méritos de los asuntos que son planteados mediante el recurso de *certiorari*, la Regla 40 del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B R. 40, enmarca los criterios que debe evaluar este tribunal al expedir un auto de *certiorari*. La aludida regla establece lo siguiente:

El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de certiorari o de una orden de mostrar causa:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. 4 LPRA Ap. XXII-B, R. 40.

Ninguno de estos criterios es determinante por sí solo para el ejercicio de jurisdicción y tampoco constituyen una lista exhaustiva. *García v. Padró*, supra. La norma vigente es que los tribunales apelativos podremos intervenir con las determinaciones discrecionales del Tribunal de Primera Instancia cuando éste haya

incurrido en arbitrariedad, craso abuso de discreción o en un error en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo. *Pueblo v. Rivera Santiago*, 176 DPR 559, 581 (2009).

### III.

Nos corresponde justipreciar si debemos ejercer nuestra facultad discrecional al amparo de los criterios enmarcados en la Regla 40 del Tribunal de Apelaciones, *supra.* Luego de examinar el expediente a la luz de los criterios de la Regla 40 del Tribunal de Apelaciones, *supra,* no identificamos razón por la cual este Foro deba intervenir. Ello, ya que no se presentan ninguna de las situaciones que allí se contemplan. Recordemos que nuestro ordenamiento jurídico nos brinda la discreción de intervenir en aquellos dictámenes interlocutorios o postsentencia en los que el TPI haya sido arbitrario, cometido un craso abuso de discreción o cuando, de la actuación del foro, surja un error en la interpretación o la aplicación de cualquier norma procesal o de derecho sustantivo. Reiteramos que en el recurso que aquí atendemos no se nos ha demostrado que haya alguno de estos escenarios.

### IV.

Por los fundamentos antes expuestos, ***denegamos*** el recurso de epígrafe.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones
